UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA          *ORIGINAL*

Before The Honorable HAYWOOD S. GILLIAM, JR., Judge

| | |
|---|---|
| KEVIN BARRY FINE ART ASSOCIATES, )<br>a California corporation, ) | **Motion to Dismiss** |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. C 18-03358 HSG |
| ) | |
| KEN GANGBAR STUDIO, INC., a ) | |
| Canadian Corporation, ) | Pages 1 - 28 |
| ) | |
| Defendant. ) | Oakland, California |
| _____ ) | Thursday, January 17, 2019 |
| KEN GANGBAR STUDIO, INC., a ) | |
| Canadian Corporation, ) | |
| Counterclaimant, ) | |
| ) | |
| vs. ) | |
| ) | |
| KEVIN BARRY FINE ART ASSOCIATES, ) | |
| KEVIN A. BARRY, RICHARD McCORMACK) | |
| DESIGN STUDIO d/b/a STUDIO ) | |
| McCORMACK, RICHARD McCORMACK, ) | |
| JOHN JOHNSON, DOES 1-20, and ABC ) | |
| corporations 1-20, ) | |
| Counterclaim Defendants.) | |
| _____ ) | |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff and          Enenstein Pham & Glass
                           12121 Wilshire Boulevard, Suite 600
                           Los Angeles, California  90025
                      BY:  NED M. GELHAAR, ATTORNEY AT LAW

(Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

## A P P E A R A N C E S (CONT'D.)

```
For Defendant and        The Business Litigation Group, P.C.
Counter-claimant Ken     555 Montgomery Street, Suite 1650
Gangbar Studio, Inc.:    San Francisco, California  94111
                    BY:  MARC N. BERNSTEIN, ATTORNEY AT LAW


For Counter-defendants   Veatch Carlson, LLP
Richard McCormack        1055 Wilshire Boulevard, 11th Floor
Design d/b/a Studio      Los Angeles, California  90017
McCormack and       BY:  KIM DOROTHY ASHLEY, ATTORNEY AT LAW
Richard McCormack:
```

--o0o--

```
 1    Thursday, January 17, 2019                     2:14 p.m.

 2                     P R O C E E D I N G S

 3          THE CLERK:  We're calling C18-3358, Kevin Barry

 4    versus Ken Gangbar Studios, Inc.

 5       Please step forward and state your appearance for the

 6    record, please.

 7          MR. GELHAAR:  Good afternoon, Your Honor.  Ned

 8    Gelhaar for the plaintiff Kevin Barry Fine Art.

 9          THE COURT:  Good afternoon, Mr. Gelhaar.

10          MS. ASHLEY:  Good afternoon, Your Honor.  Kim Ashley

11    on behalf of counter-defendants Richard McCormack and Richard

12    McCormack Design.

13          THE COURT:  Good afternoon, Ms. Ashley.

14          MR. BERNSTEIN:  Good afternoon, Your Honor.  Marc

15    Bernstein of The Business Litigation Group on behalf of

16    defendant and counter-claimant Ken Gangbar Studio.  And I have

17    Mr. -- and Mr. Gangbar is in town and at counsel table as

18    well.

19          THE COURT:  All right.

20       So let's see.  So there are motions to dismiss on calendar

21    this afternoon.  Let me just ask a few questions, and then we

22    can talk about the different claims.

23       The first is at least in the McCormack motion, at least

24    initially, there is an argument that 9 -- Rule 9B applied to

25    all of the counterclaims.  But it doesn't appear based on the
```

1    reply that that argument is still being maintained.

2        Does everyone agree that Rule 9B's heightened pleading

3    standard does not apply to the claims that are at issue on the

4    motion to dismiss?

5            **MS. ASHLEY:**  Yes, Your Honor.  I'll concede that.

6            **THE COURT:**  All right.  So I can just analyze it

7    under a normal Rule 8 pleading --

8            **MS. ASHLEY:**  Yes, Your Honor.

9            **THE COURT:**  -- analysis.

10           **MR. BERNSTEIN:**  Yes, Your Honor.

11           **THE COURT:**  All right.  That's helpful.

12           **MR. BERNSTEIN:**  And we would also add for Ken Gangbar

13   Studio Inc., to the extent the argument shifted to new ground

14   in the reply under Rule 8, that that should not be considered

15   as -- as new material in our reply.

16           **THE COURT:**  Okay.

17       So then I thought the sort of most substantively

18   interesting issue is this question of whether infringement has

19   been adequately pled at the 12(b) stage.  And really that

20   relies on the idea that the extrinsic test is something that

21   the court can address as a matter of law even at the Rule

22   12(b)(6) stage.  And I thought it was interesting.  I dug into

23   that a little bit.

24       Obviously, the *Rentmeester* case from the Ninth Circuit

25   came out last year and did over a dissent find that the

1    district court was correct in conducting that analysis as a

2    matter of law even at the 12(b)(6) stage.

3          It looks to me that other than that case in the Ninth

4    Circuit, there's been one other case from 1945 comparing maps.

5    And obviously the dissent in *Rentmeester* pointed that out.

6          I found another unpublished Ninth Circuit case in which

7    there was a concurrence, wondering whether that is too

8    aggressive given the normal rule that even summary judgment is

9    disfavored in the copyright infringement context let alone

10   dismissal as a matter of law based on the complaint.

11         It strikes me that a further complication here is that I'm

12   dealing with sculptures.  The actual works about sculptures.

13   They're not photos.  They're not prints.  They're

14   three-dimensional sculptures.  And as to one of them, the

15   Nanea work, I'm not even being presented, it seems to me with,

16   a photograph of the sculpture but rather what looks to be some

17   kind of rendering from a hotel website that makes it hard for

18   me to tell exactly what is depicted.

19         So all of that is to say I've got some question as to

20   whether the 12(b)(6) stage is the right stage for this

21   analysis even understanding that at summary judgment or later,

22   those issues will have to be joined.

23         So who wants to respond to that?

24         **MR. GELHAAR:**  I take the court's point, Your Honor.

25   And, you know, our -- we believe that it's simply apparent,

1  given the background, that the only similarity is the idea and

2  that that comes across clearly.

3      However, our -- the thing we'd like to focus on more is

4  whether what's alleged in this case could potentially be

5  criminal conduct and therefore a predicate act under RICO,

6  which we think is -- is a stronger argument, which we think is

7  clear under Ninth Circuit law.

8          THE COURT:  Are you conceding the other argument?

9          MR. GELHAAR:  I -- I will -- actually, I won't

10  concede it.  I think that simply on the face of it -- and I

11  want to point out that the Westin Nanea is a screen shot.  The

12  actual installation, I believe, is something different,which

13  is implied from the fact that they -- they used the screen

14  shot.  But, you know, the first thing on my list was to say

15  that substantial similarity is not an issue that is, it seems,

16  given to oral argument on -- on law and motion.

17      It does seem to us that if you simply look at the

18  comparisons of the works, that the only similarity is in -- is

19  in concept, in the idea of having rock-shaped natural things

20  up on a wall.  If that does not strike the court as clear as

21  it does to us, then, obviously, that issue would go forward.

22          THE COURT:  All right.  Fair enough.

23      Any response on that point?

24          MR. BERNSTEIN:  No, Your Honor.  I -- We agree with

25  Your Honor's comments.

1          **THE COURT:**  All right.

2          All right.  Then with regard to the RICO issue, I hope

3     it's not speaking out of school to say that RICO is one of the

4     statutes that I have some questions about were I king of the

5     world or were I a legislator.  But I'm not, and I realize

6     that.

7          It seems to me that there are two pretty clearly framed-up

8     approaches to this issue, one from *Stewart* and one from the

9     District of Massachusetts case, and I just have to pick.  And

10    so I don't know that there's all that much more that you all

11    can add on that point.  I'll just have to decide which

12    approach I think is warranted.  And I -- I think what's

13    animating the *Stewart* case is what's -- well, you won't be

14    surprised based on the remark that I just made -- I think that

15    you could argue that civil RICO has had some runaway

16    consequences.  And I understand fully that the Ninth Circuit

17    and the Supreme Court tell all district judges that it's not

18    our job to fix the problem that Congress created, so I get

19    that.

20         And I think the Massachusetts case is saying just read it

21    on its face and whether it makes a lot of sense or not, that's

22    what we're stuck with.  And in the end, I'll have to decide

23    where I come out on that.

24         So I don't know if you have more to add to what's in your

25    papers, but I think that choice is pretty well teed up for me.

1    **MR. GELHAAR:** Your Honor, if I could, I'd like to

2    make an additional couple of arguments that were not covered

3    in *Stewart*, if I may.

4        And -- and one of them I think is teed up nicely by the

5    Ninth Circuit's decision in *Gordon*, which came out seemed like

6    a week before I filed my reply brief.  And although *Gordon* was

7    in the copyright context, it essentially said that the Lanham

8    Act has to be read so it doesn't conflict with the

9    Constitution, specifically so it doesn't conflict with free

10   expression guaranteed by the First Amendment.

11       Now, the Copyright Act has for over a century dealt with

12   the balance between artist's rights and the public's right

13   between the First Amendment and the Copyright Act.

14       But it's a whole different ballgame when you are saying

15   that expressive conduct, and -- and that's what this case is

16   about.  I mean, the accused works are expressive conduct.  So

17   the rationale I believe of the -- of the Ninth Circuit's

18   opinion in *Gordon* that the statutory law has to be interpreted

19   so it doesn't conflict with the Constitution dictates that we

20   not read the criminal Copyright Act and we not read the RICO

21   Act such that expressive conduct could put somebody in jail,

22   that somebody could use an art work as an inspiration and

23   potentially fall short of distinguishing the new creation from

24   the old creation and spend five years in prison for it or have

25   the ruinous liability that RICO provides, that that is by far

1    a (sic) undue chilling on expressive conduct.

2            **THE COURT:**  What in *Gordon*'s discussion of the Lanham

3    Act suggested that that principle might apply to RICO when

4    *Odom* and all of these other cases essentially tell district

5    courts, whether you think it makes sense or not, it's what

6    Congress did, and it's not for us to salvage the issue even if

7    it creates these bad consequences, and if it does, then maybe

8    that's something that Congress ought to take up.

9            **MR. GELHAAR:**  Well, that's a critical -- it's a

10   critical point because -- I haven't read every one of those

11   cases, but I'm quite sure none of them involved expressive

12   conduct.  There's no expressive conduct involved in wire fraud

13   or mail fraud.

14       There is expressive conduct, clearly, unquestionably in

15   this case.  If you look carefully at the allegations, there

16   are many, many allegations where my client is accused of

17   copying, of pirating, of counterfeiting.  But if you actually

18   look at the works, and you actually at what's alleged, that's

19   simply not what has ever happened.

20       And if I -- I admit that if what you are doing is making

21   an identical copy of a DVD or computer software, there's no

22   expressive conduct there.  But if what -- what is alleged

23   here, you are seeing one of Mr. Gangbar's works and saying,

24   "that looks great.  I'd like to have something like it."  Then

25   clearly, what my client is accused of, what my client is

1    potentially facing enormous liability and could potentially

2    face prison for is expressive conduct, and that violates --

3    that violates the Constitution.

4         It's a clear violation of the First Amendment.  And that

5    was the concern of the Ninth Circuit in *Gordon*, that even

6    though the Lanham Act says nothing about whether expressive

7    conduct is involved, the Ninth Circuit stated clearly, we have

8    to read the -- we have to read the Lanham Act so that it

9    doesn't offend the Constitution.

10        Similarly, Your Honor, courts have to read RICO and the

11   criminal Copyright Act so it doesn't violate the Constitution.

12        And if I could, if you actually focus on what's alleged,

13   in paragraph 17, the complaint alleges that a representative

14   of my client contacted Mr. Gangbar and attached a copy of --

15   or attached photographs of Mr. Gangbar's work and said, I have

16   a client who wants something similar.  "Similar."  And asked

17   if he could create something.

18        So what my client is being accused of is creating -- is

19   creating new art, new expressive art.  I believe that the same

20   was true in *Stewart* because you're talking about a screen

21   play, so that was expressive work.  *ICONICS* -- and what I

22   think makes *ICONICS* really relevant to this situation, *ICONICS*

23   was about a precise duplicate of source code.  It was not

24   about expressive conduct to the extent source code could even

25   be expressive conduct, there was duplication, precise copying

1    so -- so it's irrelevant, I think -- I mean I just don't think

2    it controls the situation because this is a very situation --

3    very different situation that involves art, that involves

4    among -- yeah, I mean the clearest expressive conduct, the --

5    the you know, a fundamental thing that's protected by our

6    constitution.  So I don't think it is the choice.  I don't

7    think the -- the Ohio case has anything to do with this

8    situation.  This is a very different situation because it

9    involves art.

10           **THE COURT:**  Which Ohio case?

11           **MR. GELHAAR:**  *ICONICS* -- was that Ohio?

12           **THE COURT:**  I thought it was Boston.  Am I wrong?

13           **MR. GELHAAR:**  I'm sorry, Your Honor.

14       I don't have --

15           **THE COURT:**  Yeah, District of Massachusetts.

16           **MR. GELHAAR:**  Okay.  My bad.

17       But again, the allegations -- and most importantly the

18   pictures show that each and every accused work is an

19   expressive work.  It's a creation.  It may -- we don't think

20   so, but it may come too close to the original works but that

21   doesn't make it any less an expression and that brings me to

22   the second point which I don't believe Judge *Stewart* -- I'm

23   sorry -- Judge Morrow covered in *Stewart*, which is the actual

24   structure of the statute itself.

25       Mr. Gangbar or opposing counsel points out that 19 --

1    Pardon me.  I'm sorry.  2319(c) and (d) specifically prohibit

2    what they call "small-scale infringement."  And their

3    penalties apply to them.

4         2319(a), which is the criminal act, simply broadly says

5    all willful infringement for financial gain is criminal.  If

6    that's true -- I mean, if it -- if it's really as broad as

7    they contend it is, then that -- then that renders 23-(c) and

8    (d) surplusage because (c) and (d) would be subsumed by (a).

9    (a) would cover everything in the world.  (a) would cover --

10   If it were truly this broad, (a) would cover an artist being

11   inspired by another artist and creating a new work that came

12   too close and was therefore copyright infringement.  It would

13   result in imprisonment of an artist.

14        Your Honor, that's anathema (sic).  That's -- That's

15   impossible in the United States.  What's -- What's being

16   attacked here is -- unlike mail fraud and wire fraud and all

17   the things that prior courts have said, hey, we may think it's

18   too broad -- what's being attacked here is a constitutional

19   right, is free expression.  And what's at risk here is

20   chilling of all artistic creation, because if somebody sees

21   one of Mr. Gangbar's works or any work and says, I like that.

22   I want to make it similar.  I want to make another wall

23   sculpture with rocks.  If they were facing the risk of five

24   years of imprisonment, then they aren't going to do it.

25        So the effect of what's trying to be accomplished here is

1    a huge chilling of First Amendment rights, is a huge chilling

2    of -- of the right of free expression.

3        We think it goes too far for copyright law, but it

4    certainly goes too far for the Constitution.  That's what's at

5    issue here.

6            **THE COURT:**  All right.  And I take your point.  Is

7    that a beef with RICO or civil RICO?  Or are you claiming that

8    the criminal statute itself is unconstitutional?

9            **MR. GELHAAR:**  The criminal statute applied to this

10   conduct is unconstitutional.

11       And, Your Honor, I realize, you know, when you analyze a

12   statute, you start with the plain language.  Then you go to

13   the -- to the legislative intent.  And then only if need be,

14   you go to the Constitution.  And I'm taking it backwards for

15   rhetorical purposes.

16       Ultimately if the statute -- if the criminal copyright

17   statute and RICO -- we're really focusing on the criminal

18   copyright statute 'cause at the worst actually could result in

19   imprisonment for expressive conduct -- yeah, it's

20   unconstitutional, but my point, Your Honor, is if you look at

21   the legislative history and, more importantly, if you look at

22   the plain language of the statute, it just doesn't mean that.

23   It just doesn't come close.  There was no --

24       I would respectfully say there was no need for Judge

25   Morrow to look beyond the plain language of statute to say the

1   statute doesn't mean this.

2       The statute -- again, I mean, my focus is on (c) and (d),

3   having specific consequences -- I mean -- or identifying

4   specific consequences which are subsumed by (a), which would

5   make (c) and (d) surplusage.

6       It's a basic rule of construction that you don't -- you

7   don't interpret a statute -- or you interpret a statute so

8   that every word has meaning.  If you interpret (a) to cover

9   all copyright infringement, all willful infringement for

10  financial gain, then (b) (sic) and (c) are surplusage so you

11  can't interpret it that way.

12      And it's actually *Liu* in the Ninth Circuit case -- Pardon

13  me.

14              (Pause in the proceedings.)

15      **MR. GELHAAR:**  -- it's actually *Liu*, which is focusing

16  on intent -- the intent requirement in a criminal prosecution

17  where they point out that what is now (b) and (c) with the

18  specific penalties was originally the whole statute.  And the

19  reason why (a), which is very broad, was added was solely to

20  extend criminal prosecutions which previously were for movies

21  and tapes or music and -- and -- was to extend it to -- to

22  software, that there was certainly no thought of extending

23  liability -- criminal liability to art.

24      And, indeed, if you look at the -- the -- I'm sorry -- oh,

25  if you look at 2319(c) and (d), they both specifically use the

1    terms "copying" meaning precisely the same.  They don't say

2    "things that infringe copyrights."  They say "copying."  And

3    they use the term "reproduction or distribution" and

4    "reproduction or distribution" is defined in the statute to

5    mean violations of 1031 and 1033, so that specifically

6    excludes -- that specifically excludes derivative works, which

7    is 1032.

8        So Congress clearly stated in its -- it's in the plain

9    language of the statute.  There's absolutely no reason to look

10   to legislative intent.  If you read the entire statute, 23 --

11   yeah, if you read 2319 and 532, which it references, and

12   analyze it in its entirety, it's absolutely clear just based

13   on a plain reading that 2319(a) only covers actual copying and

14   I would say only covers DVD's, CD's and software.

15       But there's nothing in the legislative history and there

16   is nothing apart from a completely unthinking interpretation

17   of the statute that would say that it prohibits expressive

18   work by artists, because that's unthinkable.

19       I mean, it just -- it's not about RICO.  It's about the

20   First Amendment of the Constitution of United States.

21       So there -- you know, to -- to put things back in their

22   order, a plain reading of 2319(a) says it doesn't cover

23   expressive conduct, as Judge Morrow in *Stewart* and the Ninth

24   Circuit in *Liu* demonstrate, the legislative history and -- and

25   the U.S. Supreme Court, you know, which we -- which we go

1   through at length, demonstrate that Congress has always had a

2   very, very cautious approach to criminalizing copyright

3   violations because -- as the Supreme Court calls it, because

4   of the special concerns.  And that special concern is the

5   First Amendment, is that the Copyright Act is balanced to

6   avoid infringing on First Amendment rights.

7       So that takes us to the third point.  After the statute,

8   after the legislative history, I believe those two decided

9   and, therefore, as with Judge Morrow, there's no reason to go

10  to the Constitution.  But the Constitution, as the Ninth

11  Circuit teaches in *Gordon*, has to be used as an interpretive

12  tool when you're interpreting other laws.  So you can't

13  interpret the criminal copyright act to criminalize expressive

14  conduct.

15          **THE COURT:**  All right.  Why don't I hear from your

16  counterparts.

17          **MR. BERNSTEIN:**  Yes.  Thank you, Your Honor.

18      I think I'll start with the last point, and I'll work

19  backward to your concern about RICO generally, which it may

20  surprise you to hear I share in many contexts.

21      But let -- but starting with this point, I think what

22  Mr. Gelhaar has just argued for is the elimination of criminal

23  copyright infringement from the criminal codes all together,

24  because 2319 clearly references Section 506, the criminal

25  provision of the -- the original Copyright Act.

1          That act has always been understood to cover criminal

2     copyright infringement and "copies," as that act -- is

3     universally understood to mean, means works that are

4     substantially similar to the original.  "Substantial

5     similarity" is at the heart of copyright law.

6          What Mr. Gelhaar is contending for here is eliminating it

7     and replacing it with a requirement that if there's any

8     expressive content at all -- in other words, if the accused

9     work has any differences whatsoever from the original one,

10    then it's some kind of a constitutional violation for there to

11    be criminal copyright liability, which there never has been

12    under 506, and 506 is -- 17 U.S. 506 is what Section 2319

13    references in that section.  It's not superfluous.

14         He -- Mr. Gelhaar mentioned 2319(a) versus (b) and (c).

15    There are different penalties attached for the different

16    subsections depending on what kind of conduct you do, so none

17    of them are superfluous.

18         If Your Honor can just imagine a rule where someone

19    adds -- or a circumstance where someone adds expressive

20    content to a copy of Harry Potter.  Take one of the books,

21    write your own chapter, intersperse it with the other ones or

22    vary each chapter a little bit, even if that variation was

23    artistic, that does not insulate you from criminal copyright

24    liability if the other elements are met under 506(a).  And it

25    doesn't insulate you from copyright liability under 2319, both

1   of which cover copies, yes, but that doesn't mean exact

2   replicas.

3           THE COURT:  Well, just -- and this dovetails with the

4   point I was making at the beginning.  What actual criminal

5   cases do you think best support your theory?  Because criminal

6   prosecutors when they bring the case are under a duty not to

7   bring it unless they think they can prove beyond a reasonable

8   doubt.  There's none of this civil complaint standard.  And

9   then it goes through and the court makes a decision as to

10  whether the -- the scope of the statute is as alleged by the

11  United States.

12      Are there criminal cases that involve this kind of

13  creation of arguably similar works?  That's not a trick

14  question.  I'm just wondering.  I would be inclined look to

15  those cases where a court was really drilled down on the

16  criminal statute in the context of a criminal case and used

17  that to inform the RICO question that I'm dealing with in this

18  civil case.

19          MR. BERNSTEIN:  Um-hmm.

20          THE COURT:  As I do -- Are there cases that you think

21  are analogous in that regard that are criminal cases?

22          MR. BERNSTEIN:  Well, I'm not aware of a criminal

23  prosecution off the bat that has to do with -- an art work

24  that someone was claiming creative expression for.

25      But what I would say is Mr. Gelhaar is correct, that

1    willfulness is required.  And this will not trap artists

2    who -- and this -- here, we have not an artist but commercial

3    art dealership that's in the business of -- of selling art

4    work.  But it won't trap any of them if the person was not

5    willful.  And that -- and so criminal prosecution would need

6    to show that the person didn't just do something that was

7    similar but that they actually knew that what they were doing

8    was a copyright infringement.

9        That's the safety for those kind of cases.  I can't site

10   you a particular one right now, but what I can tell you is

11   that -- and this gets to your question about RICO itself and

12   the skepticism about RICO.  You said you have to choose

13   between the Boston case and the Southern California case, but

14   actually you don't.  I mean, it would be fine and good if you

15   make that determination.

16       But we have, I think, alleged in the complaint something

17   that is overwhelmingly a course of criminal copyright --

18   excuse me -- of a piracy and counterfeit work in this case

19   that is criminal and that does have willfulness.

20       You know I've practiced law 29 years, and I have never

21   brought a RICO claim in my career.  And before I brought this

22   one, I thought very hard about it, and I read many, many

23   cases.  And that's where I -- that's where I gleaned the

24   opinion that is similar to Your Honor's, that there are many

25   RICO cases that are brought where that somewhat -- that broad

1    language of RICO is brought and extended and kind of stretched

2    in ways that are troubling actually even -- even when I read

3    those cases.

4        This case is a case where an art dealer for 16 years and

5    probably longer had a pattern of reaching out to the

6    artists -- these are not originally created works of theirs

7    that happened to be similar, and they're not really artists.

8    This is an art dealership.  He hires someone to copy once he

9    figures the work he likes.

10       But, for example, in Brennie Brackett's case ten years

11   ago, he bought some of her prints and he actually sold them to

12   Hilton in the sense that he showed them to Hilton for a model

13   room.  They accepted it.  And then he went to Brennie and

14   said, I'll give you five bucks a shot.  When she said no, he

15   hired someone to photoshop them.

16       And, Your Honor, if I may, I have a hand-up of the exhibit

17   to our counterclaim.  I don't know if you have it handy, but

18   it's -- it's striking.  If I can hand this up, this is the

19   *Brennie Bracket* case (handing document).

20           **THE COURT:**  You may.

21           **MR. GELHAAR:**  Thank you.

22           **MR. BERNSTEIN:**  So what Mr. Barry and his art

23   dealership did, they took -- they bought legitimate limited

24   edition copies of the works at left.  They then went to a

25   printing shop -- well, actually, they first went to Hilton and

1   got Hilton's signoff that these were good for the rooms.

2       Then they approached Ms. Brackett's representative, who

3   declined to sell them for $5 each.  And then they hired a

4   printing shop and had it hire a photoshop artists to make the

5   changes that you see here.  And this was one of six that we've

6   listed of these past cases.  And in this case, Mr. --

7   Mr. Barry had to pay a substantial settlement for copyright

8   claims.

9       Now, there was no liability obviously admitted there, but

10  this isn't the only one.  There's three other past cases where

11  Mr. Barry had to pay a cash settlement having been accused of

12  copyright infringement.  And we have also that he changed the

13  name of the artist on these two pieces to the right to Smith

14  and Johnson from Brennie Brackett.

15      And if you're talking about is this counterfeit, I would

16  say it's counterfeit.  The Hilton Hotel Corporation thought

17  they were getting one thing.  Then they were given something

18  with a different name, which was -- I mean, you can judge for

19  yourself how close these are.  Yes, there's differences.  But

20  under Mr. Gelhaar's rule, these would be exactly identical for

21  there to be criminal copyright infringement liability.

22      And I would maintain that there could well be a U.S.

23  Attorney's Office that looks at a course of conduct like this

24  over -- over many decades, where it's over and over and over

25  again -- in another case, he used the word "Koury" for the

 1   artist Kaoru Mansour, changing her name after he didn't have

 2   permission to sell rights to her work for display on

 3   television.

 4        So we have here allegations of 2,000 copies over 16 years.

 5   Those are just the ones we know about before discovery.

 6        There have been criminal copyright infringement

 7   prosecutions, Your Honor, that we do cite in our papers for

 8   300 copies at $5 each of bootleg movies where someone held a

 9   wobbly camera at a movie theater.  That was prosecuted

10   criminally under 2319.

11            **THE COURT:**  But isn't that the point, that there's no

12   creation involved?  That's a copy, just an out-and-out copy.

13            **MR. BERNSTEIN:**  Yeah, that's -- that's one of

14   Mr. Gelhaar's points.  But my point would be that if

15   Mr. Gelhaar's suggested legal interpretation is correct, then

16   all those bootleg people would need to do would be to add

17   expressive elements to those copies, and they would be

18   insulated.  And that can't be the case.

19        I mean, go back to the example of Harry Potter, where you

20   change -- you do a search and replace and change all the

21   characters names, or you -- you do something more creative and

22   change how the story goes a little bit but largely duplicate

23   the text.  Those are analogues to these photographs that are

24   in front of you where Mr. -- Mr. Barry and his company believe

25   that all they need to do is make any change -- and this is

1   their argument -- that if there's any change whatsoever, then

2   they're insulated from willfulness; they're insulated from

3   criminal liability; and then they're also subject to the First

4   Amendment.

5       And I do want to briefly touch on the *Gordon* case because

6   that's very distinguishable.  In *Gordon*, as Your Honor knows,

7   it was a trademark case and it's a trademark doctrine, so if

8   you're going to do a book or movie about Ginger Rogers and

9   Fred Astaire, you get to use their names and not have

10  trademark worries if that's woven into your creative

11  expression.

12      Same thing for Pepsi if it comes up in a story and it's

13  not irrelevant, that's fine.

14      In this case -- In the case of -- if you were to try to

15  import that doctrine, as Mr. Gelhaar would like, into

16  copyright law, what you have is there will always be an

17  expressive element in the accused work because copyright

18  protects expression.  So you end up with a doctrine where the

19  First Amendment gets implicated in each and every case because

20  every single case involves expression on the other side.  And

21  you also get a doctrine that's incoherent because the

22  presumption of First Amendment protection can only be rebutted

23  by showing, for example, that there's -- that consumers are

24  very severely misled -- that's one of the ones -- or that

25  it -- or that the work doesn't have anything to do with the

1   rest of the artistic expression.

2       Those don't make any sense.  And those rebut -- those

3   rebuttable points are baked into the First Amendment

4   jurisprudence of the court in *Gordon*.  And they do not

5   transfer to copyright law.

6       And once again, the -- the extension of Mr. Gelhaar's

7   arguments, even with *Gordon*, is if -- only if there's an exact

8   copy with not the tinniest bit of new creation are you safe

9   for (sic) a prosecution.  And, again, it can't be the case,

10  because then a serial infringing company such as Kevin Barry

11  Fine Art Associates would know that they'd need only make the

12  smallest change to anything they steal and they'll be

13  insulated, and that's -- that's not how 506(a) works.  That's

14  not how 2319 --

15      I don't have a case where 2319 was used for art work.  I

16  could -- I could look and find some or see if there are some

17  around 'cause I didn't think of that specific question.  But

18  it can't be the case that the smallest change and addition of

19  creative artistry insulates somebody from criminal prosecution

20  or from RICO.

21      So we would submit, Your Honor, that a course -- a pattern

22  of practice of counterfeiting and piracy, even if you side

23  with the case in the Southern -- or the Central District of

24  California, the *Stewart* case, even so, we think we're clearly

25  over the line there, especially on the 12(b)(6).  And we

1    separately feel that that's not -- that should not be a

2    requirement because of the -- the Ninth Circuit's admonitions

3    that although the statute has been abused, the courts are not

4    the proper place to rectify imperfections.

5              MR. GELHAAR:  May I respond, Your Honor?

6              THE COURT:  You may.

7              MR. GELHAAR:  I -- Three key points.  The -- The --

8    when opposing counsel said you could just add some artistic

9    expression and yet could still be criminally prosecuted, that

10   flies in the face of *Gordon*.  I think it flies in the face of

11   essential constitutional jurisprudence.

12       *Gordon* says that -- essentially the test in *Gordon* is if a

13   prima facie is made that there is some expressive aspect, the

14   burden shifts to the other side to show it that has nothing to

15   do -- that the -- that the expressive aspect has nothing to

16   do -- nothing, and that's not the right term, but it's a

17   similarly absolute law.

18       That's the respect that the Ninth Circuit pays to the

19   Constitution of the United States -- respect that the federal

20   courts pay to the Constitution of the United States.

21       And I would submit that it's a great example.  The Harry

22   Potter thing is a great example.  Now, if you just went

23   through and randomly changed the names, that's probably not

24   creative.  But if you wrote a new chapter, that's protected.

25   There may be civil liability for that.  Sure.  We can make

1    people pay stuff.  That's not going to chill expressive

2    conduct.

3        But is it possible that someone would go to prison for

4    writing a new chapter in a Harry Potter book?

5        And, Your Honor, I -- I -- I would invite any research to

6    see if there is ever been any prosecution of expressive

7    conduct.

8        I would submit from what I have found -- and certainly the

9    cases that they submit in their briefs invariably for criminal

10   cases involve precise duplication, exact copying.

11           **THE COURT:**  I actually would be curious if the

12   parties are willing to take -- I'll give you however long you

13   want -- a week or two weeks on that question, just to find --

14   let me know if there's ever been a criminal copyright

15   prosecution that was not based on duplication.

16           **MR. GELHAAR:**  And could I enlarge it to duplication

17   or expressive conduct, 'cause I think either one, there won't

18   be one in either area.  And if I could, Your Honor --

19           **THE COURT:**  Well, I think there will be

20   duplication-type cases.

21                   (Simultaneous colloquy.)

22           **MR. GELHAAR:**  I'm saying one that wasn't.

23           **THE COURT:**  Right.  Yes.  Right.  Okay.

24           **MR. GELHAAR:**  And, Your Honor --

25           **THE COURT:**  Stop.

1     Everyone get the assignment?

2          MR. BERNSTEIN:  Yes, Your Honor.

3          THE COURT:  How long do you need to do that?

4          MR. GELHAAR:  Two weeks would be plenty.

5          THE COURT:  All right.  Let's say two weeks.

6          MR. GELHAAR:  But if I may -- and I realize I'm

7     taxing the court's patience.  If I could enlarge my homework

8     assignment, just to be perfectly blunt, in going through this,

9     I don't think we've made the pure statutory interpretation

10    argument as well as we could, as well as we should.  I don't

11    think we need to reach any of this constitutional stuff.  It's

12    fascinating.  It's the funnest part of the case, but I don't

13    think we need to do anything more than analyze 2319.  And I

14    don't feel like I laid that out sufficiently for the court.

15    And I would ask the court to allow me to also include just a

16    straight bare-bones statutory interpretation of 2319 in order

17    to show that the conduct at issue here is outside of it, just

18    from a pure statutory interpretation perspective.

19         THE COURT:  I think I understand the argument as you

20    made it today, so I've got enough to conduct that analysis.

21         MR. GELHAAR:  All right.  Thank you, Your Honor.

22         THE COURT:  All right.

23    Anything further?

24         MS. ASHLEY:  Your Honor, just to clarify, may the

25    McCormack defendants submit also a response in answer to your

1    question?

2              **THE COURT:**  Yes.

3              **MR. BERNSTEIN:**  Okay.  I have nothing further, Your

4    Honor.

5              **THE COURT:**  All right.  Why don't I take it under

6    submission.  I'll wait for your supplemental submission.  With

7    that, obviously, you don't need a ton of argument.  You can

8    just give me the cite and basically what the case held, I

9    think, is -- probably would be simplest.  And, obviously, I'll

10   do my own review of the cases.  But I think just identifying

11   the cases that you find or saying "We couldn't find any" would

12   be helpful.

13             **MR. BERNSTEIN:**  And these are cases that were -- any

14   criminal copyright prosecutions of non-exact duplicates is

15   that is the --

16             **THE COURT:**  Exactly.

17             **MR. BERNSTEIN:**  -- scope?  Okay.

18       Thank you.

19             **THE COURT:**  All right.

20             **MR. GELHAAR:**  Thank you, Your Honor.

21             **THE COURT:**  Submitted.

22             **MS. ASHLEY:**  Thank you, Your Honor.

23            (Proceedings were concluded at 2:56 P.M.)

24                         --o0o--

25

1

2                         **CERTIFICATE OF REPORTER**

3

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that I am neither counsel for, related to,

7    nor employed by any of the parties to the action in which this

8    hearing was taken, and further that I am not financially nor

9    otherwise interested in the outcome of the action.

10

11           _____

12              Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13                   Thursday, January 24, 2019

14

15

16

17

18

19

20

21

22

23

24

25